**CV-04 2585**   ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BLOCK, J.

FILED
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y
★ JUN 2 2 2004 ★
BROOKLYN OFFICE

)
TWIST PARTNERS, Individually And On Behalf )
Of All Others Similarly Situated,          )
                                           )
                    Plaintiff,             )
                                           )
vs.                                        )
                                           )
HANGER ORTHOPEDIC GROUP, INC.,             )
THOMAS F. KIRK, GEORGE E. McHENRY,         )
AND IVAN R. SABLE,                         )
                                           )
                    Defendants.            )
                                           )
                                           )

CASE NO.

MANN, M.J.

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS

**JURY TRIAL DEMANDED**

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of regulatory filings and reports, securities analyst reports and advisories about Hanger Orthopedic Group, Inc. ("Hanger" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the securities of Hanger between July 29, 2003 and June 14, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Hanger describes itself as "the world's premier provider of orthotic and prosthetic patient-care services." The Company's business and stock price are crucially dependent on

maintaining compliance with federal and state rules, and its reputation in the health care community.

3.     Throughout the Class Period, the Company performed poorly and defendants were under tremendous pressure to meet the expectations they themselves had set and thereby maintain their credibility. To achieve this end, they resorted to an illegal scheme to bilk the Medicaid and Medicare programs, the Veterans Administration and private insurers. Specifically, unbeknownst to investors, during the Class Period, Hanger improperly booked sales by filling out fake prescriptions and adding items that were not prescribed for existing patients in order to increase bills to Medicare and Medicaid. This practice not only artificially inflated Hanger's revenues and earnings, it also jeopardized Hanger's status as a Medicare and Medicaid provider, and its relationships with private insurers. It was, therefore, highly relevant to investors seeking to evaluate the effectiveness of the Company's operations.

4.     The truth emerged on June 14, 2004, after the close of trading, when NBC News aired an investigative report in which a Hanger employee described the Company's fraudulent billing practices. The next day, the Company issued a news release over the *PR Newswire* in which it admitted that the Company had initiated an investigation into "billing irregularities." The Company's shares had opened on June 14, 2004 at $15.75. They closed out the day at $14.41 and fell to a closing price of $12.75 on June 15, 2004 on heavy trading volume of 2.4 million shares for a two-day drop of 19 percent.

5.     Defendants were motivated to engage in the fraud alleged herein so that Hanger insiders could sell their personally held Hanger stock at artificially inflated prices. Throughout

- 2 -

the Class Period, Hanger insiders sold 120,270 shares of their Hanger common stock at artificially inflated prices, reaping gross proceeds in excess of $1,931,198.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j (b) and 78t (a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act.

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).   Many of the acts charged herein, occurred in substantial part in this District and Hanger conducts business in this District.

9.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.     Plaintiff Twist Partners as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Hanger at artificially inflated prices during the Class Period and has been damaged thereby.

11.     Defendant Hanger purports to be the largest owner and operator of orthotic and prosthetic ("O&P") patient-care centers in the United States.

- 3 -

12.     Defendant Thomas F. Kirk ("Kirk") was, at all relevant times, Hanger's President, Chief Operating Officer and a Director.

13.     George E. McHenry ("McHenry") was, at all relevant times, Hanger's Chief Financial Officer.

14.     Ivan R. Sable ("Sable") was, at all relevant times, Hanger's Chairman and Chief Executive Officer.

15.     Defendants Kirk, McHenry and Sabel are referred to herein as the "Individual Defendants."

16.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Hanger, were privy to confidential and proprietary information concerning Hanger, its operations, finances, financial condition, present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Hanger, as discussed in detail below. Because of their positions with Hanger, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.     The Individual Defendants are liable as direct participants in, and as co-conspirators, with respect to the wrongs complained of herein. In addition, the Individual

- 4 -

Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Hanger's business.

18.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

19.     As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock was, and is, registered with the Securities and Exchange Commission (the "SEC") pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Hanger's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Hanger's common stock would be based upon truthful and accurate information.

- 5 -

The Individual Defendants misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants are liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Hanger common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding Hanger's business, operations and management and the intrinsic value of Hanger common stock, (ii) enabled Hanger insiders to sell thousands of shares of Hanger stock for proceeds in excess of $1.9 million; and (iii) caused plaintiff and members of the Class to purchase Hanger common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Hanger between July 29, 2003 and June 14, 2004 inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and/or directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Hanger common shares were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or

- 6 -

206095_1

DOCS\206095v1

thousands of members in the proposed Class. Record owners and other members of the Class
may be identified from records maintained by Hanger or its transfer agent and may be notified of
the pendency of this action by mail, using the form of notice similar to that customarily used in
securities class actions.

23.     Plaintiff's claims are typical of the claims of the members of the Class as all
members of the Class are similarly affected by defendants' wrongful conduct in violation of
federal law that is complained of herein.

24.     Plaintiff will fairly and adequately protect the interests of the members of the
Class and has retained counsel competent and experienced in class and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and
predominate over any questions solely affecting individual members of the Class. Among the
questions of law and fact common to the Class are:

> (a)    whether the federal securities laws were violated by defendants'
> acts as alleged herein;
>
> (b)    whether statements made by defendants to the investing public
> during the Class Period misrepresented material facts about the business and
> operations of Hanger; and
>
> (c)    to what extent the members of the Class have sustained damages
> and the proper measure of damages.

26.     A class action is superior to all other available methods for the fair and efficient
adjudication of this controversy since joinder of all members is impracticable. Furthermore, as
the damages suffered by individual Class members may be relatively small, the expense and
burden of individual litigation make it impossible for members of the Class to individually

- 7 -

redress the wrongs done to them. There will be no difficulty in the management of this action as
a class action.

## SUBSTANTIVE ALLEGATIONS

27.     Hanger is an owner and operator of O&P patient-care centers in the United
States. In its orthotics business, it designs, fabricates, fits and maintains a wide range of standard
and custom-made braces and other devices.  In its prosthetics business, it designs, fabricates, fits
and maintains custom-made artificial limbs.  The Company derived 44.8%, 43.9%, and 40.5% of
its net sales for the years ended December 31, 2003, 2002 and 2001, respectively, from
reimbursements for O&P services and products from programs administered by Medicare,
Medicaid and the U.S. Veterans Administration.

28.     Throughout fiscal year 2003, the Company struggled but failed to meet
performance expectations and, in its annual report for the year ended December 31, 2003,
reported "disappointing sales growth" in its patient care centers, and net income of $16.2 million
for 2003 compared to net income of $23.6 million in 2002.  The Company's earnings as reported
by the Company are as follows:

| Date of Earnings Release | Quarter Reported | Reported Net Sales ($mil) | Reported Earnings ($mil) | Reported EPS |
|---|---|---|---|---|
| July 29, 2003 | 2003 Second Qtr. | 138.90 | 9.40 | $0.35 |
| October 30, 2003 | 2003 Third Qtr. | 140.00 | 8.80 | $0.33 |
| February 25, 2004 | 2003 Fourth Qtr. | 142.80 | (10.74) | ($0.52) |
| | 2003 Year End | 547.80 | 5.23 | $0.39 |
| April 28, 2004 | 2004 First Qtr. | 131.60 | 3.62 | $0.16 |

- 8 -

29.    Compliance with the state and federal regulations that governed its operations,

and in particular, compliance with Medicare and Medicaid regulations, was highly material to the

Company because noncompliance could result in significant penalties, including exclusion from

the Medicare and Medicaid programs, which could have a material adverse effect on Hanger's

business, as well as damage to Hanger's reputation and credibility.  Accordingly, throughout the

Class Period, defendants warned of the dangers of noncompliance while simultaneously stating

that they "make every effort" to maintain compliance, and had the appropriate procedures in

place to maintain compliance.  In this regard, the Company's Form 10-K for the 2003 stated as

follows:

> We are subject to a variety of federal, state and local governmental
> regulations. *We make every effort to comply with all applicable regulations
> through compliance programs, manuals and personnel training.* Despite these
> efforts, we cannot guarantee that we will be in absolute compliance with all
> regulations at all times.
>
> Fraud and Abuse. Violations of fraud and abuse laws are punishable by criminal
> and/or civil sanctions, including, in some instances, imprisonment and exclusion
> from participation in federal healthcare programs, including Medicare, Medicaid,
> U.S. Veterans Administration health programs and the Department of Defense's
> TRICARE program, formerly known as CHAMPUS. These laws, which include
> but are not limited to, antikickback laws, false claims laws, physician self-referral
> laws, and federal criminal healthcare fraud laws, are discussed in further detail
> below. *We believe our billing practices, operations, and compensation and
> financial arrangements with referral sources and others materially comply with
> applicable federal and state requirements.* However, we cannot assure that such
> requirements will not be interpreted by a governmental authority in a manner
> inconsistent with our interpretation and application. The failure to comply, even if
> inadvertent, with any of these requirements could require us to alter our operations
> and/or refund payments to the government. Such refunds could be significant and
> could also lead to the imposition of significant penalties. Even if we successfully
> defend against any action against us for violation of these laws or regulations, we
> would likely be forced to incur significant legal expenses and divert our
> management's attention from the operation of our business. Any of these actions,

- 9 -

individually or in the aggregate, could have a material adverse effect on our business and financial results. [. . .]

False Claims Laws. We are also subject to federal and state laws prohibiting individuals or entities from knowingly presenting, or causing to be presented, claims for payment to third-party payors (including Medicare and Medicaid) that are false or fraudulent, are for items or services not provided as claimed, or otherwise contain misleading information. Each of our patient-care centers is responsible for preparation and submission of reimbursement claims to third-party payors for items and services furnished to patients. In addition, our personnel may, in some instances, provide advice on billing and reimbursement to purchasers of our products. While *we endeavor to assure that our billing practices comply with applicable laws*, if claims submitted to payors are deemed to be false, fraudulent, or for items or services not provided as claimed, we could face liability for presenting or causing to be presented such claims. [Emphasis added.] [Emphasis added.]

30.     The statements and financial results referenced above in ¶¶28-29 were each

materially false and misleading when made because they failed to disclose and misrepresented

the following material adverse facts, among others:

> (a)     during the Class Period, Hanger had systematically falsified prescriptions and billing to third party payors to artificially inflate its reported revenues and earnings;

> (b)     a material portion of the Company's reported revenues were derived through fraudulent business practices, such as Medicare, Medicaid and other third-party payments based on the falsified billings submitted by defendants;

> (c)     the Company's reported results did not accurately portray the Company's operations because a material portion of those results were attributable to prohibited practices;

> (d)     the Company's purported risk warnings failed to disclose that the Company had falsified billing records and defrauded federal and state governments and private insurers thereby placing its accreditation at serious risk and jeopardizing.

## THE TRUTH BEGINS TO EMERGE

31.     At 11 p.m. on June 14, 2004 WNBC aired a story that began as follows:

- 10 -

SUE SIMMONS, co-anchor:

Prescription for fraud. A whistleblower says her company is stealing hundreds of thousands of dollars of taxpayer dollars. A Newschannel 4 investigation [. . .]

32.     Simmons, with her co-anchor Chuck Scarborough, and investigative reporter Tim

Minton, went on to report that Kendall McDaniel, a Hanger employee who was in charge of

processing patients' bills, alleged that "thousands of patient files are forged or non-existent, none

of which she claims stops the company from billing taxpayers for medical devices that may or

may not have been delivered." The news segment continued as follows:

> Ms. KENDALL McDANIEL (Hanger Employee): They will come in, with say, a prescription for shoes and they will either get the shoes, but then the insurance company will be billed for shoes and additional items. And then I'm saying that there may be no patient at all, just a fake name.
>
> MINTON: The rules for reimbursement by Medicare, Medicaid, and insurance companies are strict and specific. A prescription signed by a doctor is required, and so are notes that justify why particular equipment is necessary, given the patient's diagnosis and condition. McDaniel says blank Elmhurst Hospital prescription pads and official insurance company documents are kept at the Hanger office where she says she has seen a manager fill them out.
>
> Ms. McDANIEL: Not only prescriptions, letters of medical necessities, Medicare supplier standards. Things that need to be in the chart in order to bill out to Medicare are just signed as if a doctor was signing them on a day-to-day basis.
>
> MINTON: In a statement, the New York City Health and Hospital's Corporation says, "this matter appears to involve the theft and fraudulent use of hospital prescription pads without any knowledge of Elmhurst Hospital or the physicians whose names were used."
>
> The whistleblower has hired an attorney. She says to make sure she can keep her job and follow the law. Kenneth Mollins sent a letter to federal and state prosecutors, requesting they review Hanger's files.
>
> MINTON: Hanger's response, "the company is adamant about compliance. We're conducting an internal audit. If there is something that is done inappropriately, there will be strong and immediate action."

- 11 -

But the results of an internal audit conducted last summer and obtained by Newschannel 4, show that all 15 files checked at that time had problems complying with the law ranged from no prescriptions to no justifying notes.

Overall, the company's own auditor gave a failing grade, 50 out of 100 with 80 considered compliance. In a follow-up this February, seven months later, the auditor sent an e-mail to company officials warning, "I am still very concerned about the integrity of the documents I've receive. There remain numerous altered documents."

Ms. McDANIEL: I worked for Worldcom. I got fired or laid off due to fraud. The biggest fraud in the history of the country. I've been through this, and I don't want to have it happen again. Maybe I can stop it and tell people, and maybe somebody else will come forward.

MINTON: Kendall McDaniel has been placed on administrative leave with pay until Hanger completes its internal audit. The company says it has reassigned a manager implicated in forged prescriptions and other alleged fraud to a job where he can be more closely supervised. Sue, Chuck, more to come on this.

33.     In a statement issued the following day over *PRNewswire,* the Company stated as

follows:

Hanger Orthopedic Group has been made aware of alleged billing irregularities by one clinician in one of the company's 608 patient care centers. An employee in the office reported the alleged irregularities on the Company's Compliance Hot Line ---- a confidential communications vehicle that encourages individuals to come forward with any concerns or suspicions regarding potential violations of the Company's processes or policies. The Company, in conjunction with its outside counsel, has initiated a prompt and thorough investigation of these allegations.

Ivan R. Sabel, Chairman and CEO of Hanger Orthopedic Group said "Hanger Orthopedic Group has an active internal audit team that reports to the Audit Committee of its Board of Directors and is committed to maintaining the highest standards of integrity and compliance. We take this matter very seriously. We are expending all necessary resources to bring this matter to an accurate and swift conclusion.."

34.     This news resulted in a substantial drop in the price of Hanger shares. The

Company's shares had opened on June 14, 2004 at $15.75. They closed out the day at $14.41

- 12 -

and fell to a closing price of $12.75 on June 15, 2004 on heavy trading volume of 2.4 million

shares for a two-day drop of 19 percent.

## Applicability Of Presumption Of Reliance:
## Fraud-On-The-Market Doctrine

35.     At all relevant times, the market for Hanger's securities was an efficient market

for the following reasons, among others:

> (a)     Hanger's stock met the requirements for listing, and was listed and
> actively traded on the NYSE, a highly efficient and automated market;

> (b)     As a regulated issuer, Hanger filed periodic public reports with the
> SEC and the NYSE;

> (c)     Hanger regularly communicated with public investors *via*
> established market communication mechanisms, including through regular
> disseminations of press releases on the national circuits of major newswire
> services and through other wide-ranging public disclosures, such as
> communications with the financial press and other similar reporting services; and

> (d)     Hanger was followed by several securities analysts employed by
> major brokerage firms who wrote reports, which were distributed to the sales
> force and certain customers of their respective brokerage firms. Each of these
> reports was publicly available and entered the public marketplace.

36.     As a result of the foregoing, the market for Hanger's securities promptly digested

current information regarding Hanger from all publicly available sources and reflected such

information in Hanger's stock price. Under these circumstances, all purchasers of Hanger's

securities during the Class Period suffered similar injury through their purchase of Hanger's

securities at artificially inflated prices and a presumption of reliance applies.

- 13 -

## NO SAFE HARBOR

37. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Hanger who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

38. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39. During the Class Period, Hanger and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Hanger's securities; and

- 14 -

206095_1

DOCS\206095v1

(c) cause plaintiff and other members of the Class to purchase Hanger's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

40.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Hanger's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

41.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 *et seq.*) and Regulation S-K (17 C.F.R. Sections 229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

42.     Hanger and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

- 15 -

engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Hanger as specified herein.

43. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Hanger's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Hanger and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Hanger's securities during the Class Period.

44. The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

45. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

- 16 -

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Hanger's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

46.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Hanger's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Hanger's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Hanger securities during the Class Period at artificially high prices and were damaged thereby.

47.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Hanger, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Hanger securities,

- 17 -

or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

48. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

49. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

50. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51. The Individual Defendants acted as a controlling person of Hanger within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were

- 18 -

issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

53.     As set forth above, Hanger and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Hanger's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as lead plaintiff and certifying plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiff counsel as lead counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

DATED:     June 22, 2004                    Respectfully submitted,

**MILBERG WEISS BERSHAD &**
**SCHULMAN LLP**

By: _____

Steven G. Schulman (SS-2561)
Peter E. Seidman (PS-8769)
One Pennsylvania Plaza
New York, NY 10119-0165
Telephone:     (212) 594-5300
Facsimile:     (212) 868-1229

**LAW OFFICES OF RICHARD B.**
**BRUALDI**
Richard B. Brualdi
29 Broadway
Suite 1515
New York, NY 10006
Telephone: (877) 495-1187

**Attorneys for Plaintiff**

- 20 -

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

       Twist Partners, LLP declares the following as to the claims asserted, or to be asserted, under the federal securities laws:

       1.     We have reviewed the Hanger Orthopedic Group, Inc (HGR) complaint prepared by The Brualdi Law Firm and Milberg Weiss Bershad & Schulman LLP, whom we designate as our counsel in this action for all purposes.

       2.     We did not acquire Hanger Orthopedic Group, Inc (HGR) stock at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

       3.     We are willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

       4.     We will not accept any payment for serving as a representative party beyond our pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

       5.     We have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

       6.     We understand that this is not a claim form, and that our ability to share in any recovery as a member of the class is unaffected by our decision to serve as a representative party.

       7.     During the Class Period we have made the following transactions in Hanger Orthopedic Group, Inc (HGR) and will provide records of those transactions upon request:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 100 | Buy | 11/18/03 | $ 16.45 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Please use and attach additional pages if necessary.

**I declare under penalty of perjury that the foregoing is true and correct**

Executed this 17th day of June, 2004

_____
Signature